■LOTTINGER, Judge.
The plaintiff, a commercial partnership engaged in the automobile business, instituted this suit against the defendant corporation, a lending agency, to recover the amount which it was forced to pay to the holder of an unknown chattel mortgage which had been in existence at the time the defendant had allegedly sold to plaintiff a 1940 model used Ford pickup truck. Judgment is sought in the total amount of $287.25, of which $187.25 represents the amount plaintiff was compelled to pay, and $100.00 -representing the amount prayed for as attorney fees for the prosecution of the suit. •
It is alleged in the petition that on February 14, 1949, the defendant sold the plaintiff the pickup truck for the price of $500.-00 and that at the time there were due and owing thereon three certain debts secured by chattel mortgage as follows:
“(1) That certain indebtedness due and owing by Numa Durio to the White System of Lafayette, Inc., dated August 12, 1948, in the original amount of $754.35, plus interest and costs, which said act of chattel mortgage was recorded in the Clerk’s Office, Parish of Lafayette, under Entry No. 214596, Book o*f Chattel Mortgage #21, page 583, on August 23, 1948:
“(2) That certain indebtedness due and owing by Numa Durio to Dauterive Motor Company, dated September 1, 1948, in the original amount of $231.52, .plus interest and costs, which said act of chattel mortgage was recorded in the Clerk’s Office, Parish of Lafayette, under Entry No. 215035, Chattel Mortgage Book #21, page 603, on September 7, 1948; and
“(3) That certain indebtedness due and owing by Numa Durio to Southwest Motor Company, dated January 14, 1949, in the original amount of $125.02, plus interest and costs, which said act of chattel mortgage was recorded in the Clerk’s Office, Parish of Lafayette, under Entry No. 219547, Chattel Mortgage Book #22, page 142, on January 14, 1949.”
*610 The plaintiff alleged further that at the time it did know of the chattel mortgage in favor of itself and that in favor of the defendant, but that it was unaware of the existence of the mortgage in favor of the Dauterive Motor Company. It was agreed in the sale, plaintiff averred, that the defendant would cancel its first mortgage and that plaintiff would assume the payment of its own mortgage.
The further allegation was made that on September 1, 1948 (evidently intended to mean 1949), plaintiff sold the truck with guarantee of title and free from all encumbrances, to one Duglas Duhon; that in December, 1949, the Dauterive Motor Company (holder of the outstanding second chattel mortgage) made demand on the plaintiff for payment of same at which time plaintiff called in warranty its vendor, the defendant herein, who refused to either pay the amount due or to reimburse the plaintiff in the event it should choose to pay the mortgage 'indebtedness.
The petition then sets 'forth that on January 20, 1950, the Dauterive Motor Company instituted suit against Numa Durio, the original owner of the truck and mortgage debtor, and by executory process obtained a suit of seizure and sale to satisfy its claim of $154.13 together with interest, costs and attorney fees. These proceedings are made .a part of the petition by reference and show that the truck was seized from Duhon, the plaintiff’s vendee.
Subsequently Duhon ¡made demand on the plaintiff, and it is then alleged that the plaintiff paid to' Duhon and his attorney the sum of $187.25 in full payment of the chattel mortgage and that thereafter the seizure was released. Demand was later made on the defendant for the said amount and the latter having refused payment, suit was filed for the $187.25 and $100.00 as attorney fees as well.
The delfendant in its answer denied the alleged sale to1 the petitioner but admitted the existence of the three chattel mortgages. •It then alleged that it was the holder of the first mortgage and that it learned in January, 1949, through the “Daily Legal News” of the plaintiff’s mortgage. At this time, the defendant averred, Durio’s account with it was delinquent and foreclosure proceedings had been contemplated. After learning of the plaintiff’s mortgage, a Mr. Frank Clay, a representative of the defendant corporation contacted a Mr. L. A. Bourgeois, a member of the plaintiff partnership, advised him of their first mortgage and that they were contemplating foreclosure. It is further alleged that Mr. Bourgeois then, suggested that defendant hold up any such procedure for a few days until his company could investigate the possibility of taking over the truck and paying off defendant’s mortgage without necessity of foreclosure.
The answer then sets out that later Clay, together with Bourgeois, went to-see Durio who agreed to surrender the truck to the plaintiff provided the latter be relieved of all indebtedness to both plaintiff and defendant. It was agreed at that time, defendant averred, that plaintiff would pay defendant’s mortgage and that it did pay the sum of $500.00 in full settlement of the mortgage. It is further set out that the defendant had no knowledge of the Dauterive Motor Company mortgage until advised by their attorney in December, 1949. The defendant also expressly averred that at no time did it acquire or sell to the plaintiff the truck and the $500.-00 was accepted in full settlement of the first mortgage which 'it held against the truck.
The testimony in the record is just as conflicting as the allegations of the petitioner and answer. The trial judge, in his written reasons for judgment, held that there was a lack off understanding between the parties and rendered judgment in favor of the defendant, from which judgment the plaintiff has appealed.
According to Mr. L. A. Bourgeois, a witness for the plaintiff, the track was definitely repossessed by the defendant from Durio and then sold to them. The following is his testimony in this regard:
“Q. Will you give the court the benefit of the conversation which you had with Mr. Clay? The first conversation. A. Yes, Mr. Clay told me that he had the first *611 mortgage on Mr. Numa Durio’s truck and that he was delinquent in his payments and he was going to repossess the truck. He told me that Mr. Durio owed him $550 and if I gave him $500 for the truck that he was going to repossess the truck and asked me if I would give $500 for it.
“Q. Was that conversation over the telephone? A. No, that was in my office.
“Q. Was anybody else there at the time? A. No.
“Q. What was your answer? A. I told Mr. Clay that I didn’t know the condition of the truck and if it was worth the money I would buy it from him.
“Q. You didn’t do any business with him on that particular day? A. No.
“Q. Did you meet again with Mr. Clay on the same subject matter ? A. He called me up and told me that he was going to repossess the truck that same afternoon and wanted to know if I was willing to give him $500 for the truck. I told him that I hadn’t seen the truck and that I would be glad to go out there with Mr. Theaux to let Mr. Theaux pass judgment; that Mr. Theaux was the used car man and he appraised our used cars.
“Q. Did you subsequently go out there, and if so, with whom? A. I asked him what time he was going out there and he told me. I said, T will ipick you up’, which I did. I picked him up at his office and Mr. Schilling happened to be there so he came along. From there we picked up Mr. Theaux and we went out there to Mr. Durio’s.
“Q. Did all of you get out of the car to talk to Mr. Dur-k> or did anyone stay in the car? A. If I remember correctly we all got out. I don’t remember if Mr. Schilling got out, 'but I know Mr. Theaux, Clay and myself got out. Mr. Theaux and I examined the truck and Mr. Theaux told me that it was alright to buy it from Frank for $500, if he got it back.”
Mr. Bourgeois further testfied:
“Q. You heard Mr. Clay’s testimony in court this morning, from which I gathered that it is his contention that he did not repossess the truck and did not sell it to you, but that you had agreed to take the truck and pay his prior mortgage. Is that correct? A. No, it is not.
“Q. What is your understanding of the agreement? A. I was buying the truck and not the mortgage. Now if I had been buying the mortgage I would have expected him to give me the mortgage at that time.”
Mr. Bourgeois, on re-direct examination, testified as follows:
“Q. When you decided to purchase the truck you did it then to protect your investment? A. Yes.”
The testimony of Mr. Clay, on the other hand, is diametrically opposed. He contended that at no time did his company repossess the truck and that plaintiff merely purchased the note from his company and not the truck. His testimony is as follows:
.“Q. Did you at any time have any conversation with Mr. L. A. Bourgeois in regard to the truck of Numa Durio, and if so, on what occasion did you have that conversation? A. I think it was in February, 1949, at the time when I had decided it was necessary for me to foreclose on my mortgage because Mr. Durio’s account was in such a condition that I had to take some action to protect my loan. Sometime before that I ’had seen in the legal news where Southwest Motor Company had recorded a mortgage against this same truck. After discussing the matter with my attorney I decided that I would talk to Mr. Bourgeois, calling and telling him what I was getting ready to do, that is, to seize this truck. I asked him if he would be interested in paying off my mortgage and save the cost of a law suit, and the time, and protect his mortgage in that way.
“Q. At that time, Mr. Clay, did you know that the Dauterive Motor Company of Breaux Bridge had a mortgage on that car? A. No.
“Q. But you had learned through your reading the legal news that Mr. Bourgeois, representing the Southwest Motor Company, had obtained a mortgage on said automobile? A. Yes.
*612 “Q. Did you go over to the Southwest Motor Company to have your conversation or where was it? A. As well as I can remember the first time our conversation was on the telephone. I called him up.
“Q. And subsequently you went over to see him at his place of business? A. It didn’t happen exactly like that. He told me when I spoke to him that he was interested, however, he would like to have a few days to have the truck looked at to see whether or not there was enough equity in lit for him to pay me off. We waited a few days and I called him again and the second time I called him he said he would be over right away and we would go pick up Mr. Theaux to go look at it then. * *
“Q. -In your line of business it is not unusual for you to repossess automobiles without foreclosure proceedings? A. Well, there are times that we do that when we are satisfied that there are no other liens, :but whenever the case is that we have knowledge of another mortgage, whether it be first, second or third, we never attempt repossession other than through a Sheriff’s sale. * * *
“Q. As a matter of fact before you instituted your foreclosure proceedings had you not contemplated on going to see Durio to have him surrender the truck over to you without the need of foreclosure procedure? A. No. I had knowledge of Mr. Bourgeois’ mortgage and there would have been no point in my contacting Durio to surrender the truck to me. In fact I never talked to Mr. Durio except the first time I talked to him about the liquidating conditions of his account and that was when I went there with Mr. Theaux, Bourgeois and Schilling. Previous to that he had been notified of the delinquency of his account through the regular procedure that we have. * * *
“Q. You want to give the court this version, if I understand you correctly, that Mr. Bourgeois was the one who was buying the truck direct from Numa Durio and he was just discharging and paying your first lien and chattel mortgage? A. You used the word “buying” when you asked whether or not I was taking over the truck. I will say this, that it was definitely my understanding of the deal that he was paying me off so that he could get Durio to surrender to him the truck in settlement of his indebtedness to Mr. Bourgeois. * * *
“Q. Who was the chief spokesman? A. Well, there was a lot of talking done by all of us. I might explain a little here by saying that it was understood that unless Mr. Durio would agree to surrender the truck to Mr. Bourgeois there would be no point of him paying me off to save seizure because I would have to seize it, so after the appraisal of the truck by Mr. Theaux they decided that the truck was worthwhile paying me off in order to- get it. Our next problem was to get Durio to surrender the truck to Mr. Bourgeois. I did a great deal of the talking to get Durio to surrender that truck to Mr. Bourgeois. * * *
“Q. But as a matter of fact didn’t you say instead, ‘If you don’t turn it over to me instead of Mr. -Bourgeois there will be proceedings taken’? A. No, there never had been at any time anything in my mind of getting Durio to surrender the truck to me 'because I knew of Mr. Bourgeois’ mortgage and I can assure you I had no intention of Mr. Bourgeois being paid off. There was no reason for my wanting to pay off Bourgeois’ mortgage. * * *
“Q. If the automobile had been surrendered to you you could certainly have turned -it over to Mr. Bourgeois, the holder of the other mortgage? A. You say I can. I say I never thought about it that way at all. I never gave it a thought.”
Unfortunately the testimony of the other witnesses is of little aid in resolving the conflict between that of Mr. Bourgeois and Mr. Clay. Mr. Numa Durio-, the owner of the truck, merely stated that both men talked to him. This witness could not speak English and we think it can fairly be said from his testimony as a whole that he was only concerned with and only remembers that he was losing his truck.
A Mr. Arthur Theaux, a member of plaintiff partnership, was present when the trip was made to see Mr. Durio-. This *613 gentleman apparently merely acted as plaintiff’s appraiser, for alfter having examined the truck he returned to the car and did not hear the conversation between Durio, Bourgeois and Clay. Apparently he was not interested in the details of the transaction, as is indicated by the following testimony:
“Q. Do you know of your own knowledge, Mr. Theaux, whether Mr. Clay and Mr. Bourgeois had agreed to a settlement of the indebtedness due Mr. Clay’s organization by the paying of the $500 or to a sale by Mr. Clay of the truck? A. My understanding was that if I saw fit that the truck was worth $500, I would okay the purchase of it for $500 from Mr. Clay or where it came from.
“Q. Where did you get that understanding? A. When they asked me to go appraise it and they wanted to know if I would buy it for $500.
“Q. Who asked you to go appraise it? A. Mr. Bourgeois.
“Q. And all he asked you to do was to appraise it to see if it was worth $500? A. That’s right.
“Q. But other than that you didn’t know whether it was to be a sale or payment of indebtedness to Mr. Clay? A. No, what I was interested in was to buy it at a price where I could make a profit on it.”
The only other witness was a Mr. Schilling, who apparently merely went along for the ride. His testimony is of little or no value for he stated that the transaction was. not discussed in his presence either going to or returning from the Durio home. Further, he knew nothing of the conversation with Durio as it was carried on in French, a language which he does not understand.
The plaintiff argues that even if the testimony alone is not sufficient to carry the burden of proof, that it has none the less sustained the burden by the testimony of his witnesses taken together with certain corroborative evidence. The corroborative evidence of which it speaks is, first, the check for $500.00, the inscription on which reads as follows: .
“This check is in full settlement of account shown hereon, acceptance by endorsement completes receipt in full.Ford Pickup Motor #185332815.”
We find ourselves unable to agree with plaintiff’s contention. The notation, as we see it, is not indicative of a sale or. purchase, but merely refers to an “Account”, which could just as easily mean the account due defendant by Durio. To our minds, 'in other words, the check and the notation thereon, do not constitute probative evidence one way or the other and is of no value in deciding the actual character of the transaction.
The other corroborative evidence upon which plaintiff relies is the failure of the defendant to deliver to plaintiff the mortgage note. This, plaintiff argues, indicates that the truck rather than the note was sold. It was stipidated by counsel during the trial, however, that neither the mortgage of the plaintiff nor that of the defendant ■had been cancelled. If we were to accept plaintiff’s theory, in this regard, however, then Durio would still owe the plaintiff $125.00 for Mr. Bourgeois contended he did not take the truck in settlement of his obligation but merely purchased it from the defendant. However, Mr. Bourgeois himself admits that this $125.00 indebtedness has been cancelled. We conclude, therefore, that when taken together with the surrounding circumstances, non-delivery of the note is of no importance.
The trial judge’s findings were as follows:
“The court feels that plaintiff is sincere 'in his belief that he purchased a truck from defendant, and likewise, the court is of the opinion that defendant is equally sincere in his 'belief that he was selling to plaintiff the first mortgage note which his corporation held. The court is then confronted with a situation where two reputable gentlemen of equal unimpeachable character, of equal mental capacity, and each a recognized leader in his respective field, differ materially as to what took place in an important business interview. Therefore, the only logical con- *614 elusion to be drawn is-that there was a lack of understanding between them.
“The question is not whether plaintiff understood he was purchasing the truck from defendant, but whether or not defendant understood that he was selling the truck to plaintiff.
“While this matter is the result o'f an unfortunate lack of understanding, the court is compelled under the law and jurisprudence of 'Louisiana, to reject plaintiff’s demand.”
We find ourselves in complete accord with the above holding. See Godchaux Sugars, Inc. v. Foley, 10 La.App. 697, 122 So. 161.
For the reasons assigned the judgment appealed from is affirmed.
Judgment affirmed.